## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

SEAN FENNESSY,

               Plaintiff,

      -against-

NEW YORK CITY FIRE DEPARTMENT and
CITY OF NEW YORK,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

1:25-cv-01337

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

     Plaintiff, SEAN FENNESSY, through Counsel, states for his Verified Complaint as follows:

### PRELIMINARY STATEMENT

1.   This case starkly illuminates the callous disregard for civil liberties exhibited by the Fire Department of the City of New York ("FDNY") and the City of New York ("the City") in their treatment of Sean Fennessy, a dedicated Lieutenant for the FDNY.

2.   The City implemented a COVID-19 Vaccine Mandate for all municipal employees, including Mr. Fennessy, which provided for religious accommodations. Mr. Fennessy rejects all vaccination on religious grounds. As such, Mr. Fennessy duly petitioned for a reasonable accommodation.

3.   Outrageously, the FDNY summarily dismissed Mr. Fennessy's sincere request without genuine consideration, dispatching a boilerplate and perfunctory denial letter with a vague reference to "potential undue hardship".

4.   While Mr. Fennessy's request for a religious accommodation was callously denied, the FDNY readily granted accommodations to other employees facing the same vaccine mandate, allowing those accommodated to submit weekly PCR testing in lieu of vaccination. Given that even active-duty firefighters and fire officers were accommodated with the option of weekly

testing, the FDNY's denial of Mr. Fennessy's accommodation request proves arbitrary and discriminatory.

5. The City's policies on religious accommodations are fundamentally biased, displaying religious animus against Roman Catholics, and rejecting individual religious beliefs, particularly those related to abortion, simply because they disagree with them. These policies exhibit a troubling bias by prioritizing the views of religious leaders over the sincere beliefs of individual adherents. By favoring certain preferred organized and established religions, like Christian Scientists and Jehovah's Witnesses, and denying requests where religious leaders have publicly supported the vaccine, the City effectively disregards the personal and deeply held convictions of individuals like Mr. Fennessy. This approach discriminates against those whose personal religious beliefs diverge from the public statements of their religious authorities, thereby undermining the principle of individual religious freedom. Such policies create a hierarchy of religious validity, where only certain interpretations and expressions of faith are deemed acceptable, marginalizing those who hold different, yet equally sincere, beliefs. These policies not only infringe upon Mr. Fennessy's right to freely exercise his religion but also establishes a preferential treatment of certain religious views over others.

6. The consequences of the City's egregious actions extend far beyond mere employment termination; they constitute a profound infringement upon Mr. Fennesy's religious freedoms and civil rights, leaving an indelible mark on his professional and personal well-being. This egregious violation of Mr. Fennesy's rights underscores a troubling trend of unchecked executive overreach, wherein governmental bodies wield their authority without regard for the fundamental freedoms and protections provided by our Constitution, as well as local and state legislatures.

7. This case is a poignant reminder of the imperative to safeguard individual liberties—particularly in times of crisis. The words of Supreme Court Justice Gorsuch resonate with newfound urgency, underscoring the peril of sacrificing cherished freedoms at the altar of perceived safety:

Doubtless, many lessons can be learned from this chapter in our history, and hopefully serious efforts will be made to study it. One lesson might be this: Fear and the desire for safety are powerful forces. They can lead to a clamor for action—almost any action—as long as someone does something to address a perceived threat. A leader or an expert who claims he can fix everything, if only we do exactly as he says, can prove an irresistible force. We do not need to confront a bayonet, we need only a nudge, before we willingly abandon the nicety of requiring laws to be adopted by our legislative representatives and accept rule by decree. Along the way, we will accede to the loss of many cherished civil liberties—the right to worship freely, to debate public policy without censorship, to gather with friends and family, or simply to leave our homes. We may even cheer on those who ask us to disregard our normal lawmaking processes and forfeit our personal freedoms. Of course, this is no new story. Even the ancients warned that democracies can degenerate toward autocracy in the face of fear.

*Arizona v Mayorkas*, 143 S Ct 1312, 1315 (2023) (Statement of J. Gorsuch).

## **PARTIES**

8. Plaintiff is an individual who resides in Saint John's, Florida.

9. Plaintiff was employed by the Defendants FIRE DEPARTMENT OF THE CITY OF NEW YORK ("FDNY") and CITY OF NEW YORK ("City") as a Lietenant.

10. Plaintiff worked for the FDNY from 2006, until he was constructively terminated in 2022.

11. At all relevant times, Plaintiff was an employee of the FDNY and City within the meaning of the NYSHRL and NYCHRL.

12. The Defendant NEW YORK CITY FIRE DEPARTMENT is an agency of THE CITY OF NEW YORK. THE NEW YORK CITY FIRE DEPARTMENT's principal office is located at 9 Metrotech Center, Brooklyn, New York 11201

13. Defendant CITY OF NEW YORK is a municipality organized and existing under the laws of New York State. The City of New York was and is responsible for the policy, practice, supervision, and conduct of its Officers and Agencies at all relevant times hereto. The City of New York's principal office is located at 1 Centre Street, New York NY 10007.

14. At all times herein mentioned, Defendants have been an "employer" as defined by the NYSHRL (N.Y. Exec. Law § 292(5)) and the NYCHRL (N,Y.C. Admin. Code § 8-102).

15. At all times herein mentioned, Defendants employed no fewer than fifteen (15) persons.

## **JURISDICTION AND VENUE**

16. This Court has jurisdiction under 42 U.S.C §1983, and 28 U.S.C. §§ 1331 and 1343.

17. Additionally, this Court had jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between Citizens of different States and the matter in controversy exceeds the value of $75,000.

18. Additionally, Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. §1367 to hear claims so related under the New York State Human Rights Law and the New York City Human Rights Law.

19. Venue is proper in this district under 28 U.S.C. §1391(b) because Defendant maintains a principal place of business within this District and a substantial part of the events giving rise to the cause of action arose here.

## STATEMENT OF FACTS

20. Plaintiff, Sean Fennessy, (hereinafter "Plaintiff" or "Fennessy") was employed by the FDNY from 2006 up until 2022.

21. Plaintiff began his career with the FDNY on November 19, 2006 as a firefighter.

22. In 2017, he was promoted to Lieutenant.

23. Plaintiff was stationed at Engine 325, located at in Woodside, Queens.

24. Plaintiff is a Christian.

25. Plaintiff attends mass regularly at Saint Francis of the Field in Ponte Vedra, Florida.

26. Plaintiff refuses all vaccines based on his sincerely held Christian religious beliefs.

27. Plaintiff refuses the COVID-19 vaccines in particular because he believes that they violate the sanctity of life in that all available vaccines were created using aborted fetal cell lines.

28. He believes that life begins at conception, and that abortion is murder and a sin against God.

29. He also believes that all vaccines, including COVID-19 vaccines, are a defilement of his blood.

30. He also believes that all vaccines, including COVID-19 vaccines, are a betrayal of his faith in God.

31.    Due to his sincerely held religious beliefs, Plaintiff stopped vaccinating his children years ago.

32.    Plaintiff's children currently have religious exemptions to attend school.

33.    Plaintiff has a sincerely held religious belief that conflicts with the Vaccine Mandate.

34.    Vaccination was not a condition of employment when Plaintiff was hired by the FDNY.

35.    Plaintiff's employment record with the FDNY was without blemish.

36.    At no time during Plaintiff's employment with the FDNY was he ever suspended or found to be insubordinate.

**COVID-19 and the City's Vaccine Mandate**

37.    In early 2020, COVID-19 began circulating in New York City.

38.    In March of 2020, the Governor of New York State issued an executive order closing "non-essential" businesses.

39.    Plaintiff worked throughout the COVID-19 pandemic, in person, for approximately two years.

40.    On October 20, 2021, the New York City Commissioner of Health and Mental Hygiene issued the City Worker COVID-19 Vaccine Mandate, an Order requiring all City Workers to receive a COVID-19 vaccine by October 29, 2021 (hereinafter "Vaccine Mandate").[1] Subsection eight of the Health Commissioner's Order provides for reasonable accommodations.

41.    The Defendants FDNY and the City did not collectively bargain with Plaintiff's Union, the Uniformed Fire Officers Association, before implementing or enforcing the Vaccine Mandate

---

[1] Health Commissioner's Order, accessible at https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-city-employees.pdf

42.     The Vaccine Mandate provided for reasonable accommodations on its face pursuant to section eight of the Order of the New York City Commissioner of Health and Mental Hygiene.

43.     And the Defendants implemented a procedure for accepting religious and medical accommodation requests.

44.     During this time, the City had mutual aid agreements with outside municipalities that did not have vaccination requirements and/or provided first responders to work unvaccinated with reasonable accommodation.

45.     The City also had volunteer Fire Departments who were not subject to the Vaccine Mandate or any vaccination requirement.

46.     The volunteer firefighters and personnel were permitted to work unvaccinated.

47.     The City promulgated a written policy regarding the implementation of the Vaccine Mandate and the reasonable accommodation process.

48.     This policy, entitled "FAQ on New York City Employees Vaccine Mandate" provided that "[a] sincerely held religious, moral, or ethical belief may be a basis for a religious accommodation."

49.     This policy also provided that the alternative to vaccination allowed which would not cause an undue hardship if an employee is granted a reasonable accommodation would be submission of a weekly negative test result.

50.     This policy also provided for medical accommodations.

51.     Temporary medical accommodations were provided for employees within the isolation period after COVID-19 infection and employees within ninety days of antibody treatment.

52.     Permanent medical accommodations were provided for employees who were unable to mount an immune response to COVID-19.

53.     This policy also provided that employees who requested reasonable accommodations would continue working and submitting weekly negative test results while their accommodation request was pending.

54.     Due to administrative constraints and backlog, thousands of City employees, including many FDNY employees (and FDNY firefighters and fire officers), continued working unvaccinated for many months after the Vaccine Mandate was implemented.

55.     Some of these City Workers were never placed on LWOP nor were they ever terminated, and instead continued to submit to weekly testing until the Vaccine Mandate was eventually lifted.

**Plaintiff's Religious Accommodation Request**

56.     On October 27, 2021, Plaintiff filed a request for religious accommodation based on his sincerely held religious beliefs.

57.     His request included a form entitled "Request for a Reasonable Accommodation for Religious Observances, Practices, or Beliefs" provided by the FDNY.

58.     On Plaintiff's religious accommodation request form, he identified his work position as a Lieutenant.

59.     On the form, Plaintiff requested the accommodation of weekly PCR testing.

60.     Plaintiff articulated the basis for his religious accommodation request in an 8-page letter which he attached to his religious accommodation request form.

61.     In his letter, he identified himself as a member of the Catholic Church.

62.     However, he stated that his beliefs have leaned more to his "faith in God and not the Church itself".

63.     His letter stated in pertinent part:

The reason I am writing this exemption letter, because like most people, the last year has been a trying, difficult time. As a family we believed we would find inner peace through worship. This helped in keeping us on track with our convictions and allowed us to be more resilient in return. As an officer in the FDNY, I was able to be fully aware of the situation at hand. Precautions that needed to be maintained, not only for myself but for my firefighters under

my command. I found that I was constantly looking for answers and trying to be proactive for my family and the members I was accountable for. However, it was through a random conversation with a member of my parish that I began to question the solution to this problem of Covid-19 that we had on our hands. The talk of a Covid vaccine that would help stop the spread of this disease sounded like a pragmatic solution initially. It wasn't until the summer of 2021, when I had a conversation with my close neighbor and fellow parishioner Ms. Rosemary, that I began to grow concerned. I was shocked when she explained how the Covid vaccines are designed, produced, and tested. What I found most disturbing was that to make these vaccines, they had used cells from an aborted fetus to create the cell line. At first, I didn't believe the things that came out of her mouth. I initially hoped that she was mistaken, so I set out to investigate these claims on my own. If not for my own salvation, for some sense of understanding as to why this knowledge wasn't available to me previously. As I began to research these vaccines as well as many others, I was appalled. How could I not be aware of this? Why would my doctor not explain this to me?

Currently, all the COVID-19 vaccines available in the U.S. have some involvement with human fetal cell lines. The Johnson & Johnson uses the PER.C6 Cell Lines. This cell line is derived from human embryonic retinal cells. These cells were acquired from the retinal tissue of an 18-week-old, aborted fetus. These human cells were used in not only the design and development, but also in production and confirmatory lab tests. https://s27589.pcdn.co/wp-content/uploads/2020/12/CHART-Analysis-of-COVID-19-Vaccines-02June21.pdf .

The Moderna and Pfizer vaccines were made with the help of Human Embryonic Kidney cells. This cell line is called HEK293. In one form or another, these cells were used in the research, development and/or testing of the vaccine. To be clear, this process is not nearly as harmless as one would hope or even imagine. The thought of ending an unborn baby's life for science or any reason for that matter, is unconscionable. The process of extracting these tissues and cells is a far greater evil than one can comprehend. Scientists and embryologists have stated that live cells must come from living bodies. Dead tissue would do nothing. The transplant must contain living cells, and the only way to ensure that, is to obtain them from living fetuses (https://www.catholiceducation.org/en/controversy/abortion/exploring-the-dark- world-of-vaccines-and-fetal-tissue-research-part-2.html). Dr. Paul Byrne confirmed those statements by stating "Baby is alive when dissected to get organs and tissues." When Monica Seeley replied that medical terminology can be very confusing, Dr. Byrne responded "The devil sows' confusion. He is the father of lies, after all." This article also points out the vile procedure of the abortions. With D&X (Dilation and Extraction) abortions the fetus can be killed by the harvesting process itself. The D&E (Dilation and Evacuation) abortion also known as dismemberment abortion, can be best explained by Supreme Court Justice Anthony Kennedy's graphic description: "The fetus, in many cases, dies just as a human adult or child would: it bleeds to death as it is torn… limb from limb." Kennedy added that the fetal heartbeat could sometimes be seen via ultrasound "with extensive parts of the fetus removed". This article also goes into further detail about how long a fetus can be kept alive after "surviving" abortion. Studies that were done showed that if they lowered the temperature by putting baby in refrigerator, successful dissection could occur after 1-3 hours and even one time after being stored for 24 hours. This process is undeniably evil and violates the sanctity of life. I believe this is best explained in Proverbs 6:16-19: "These are six things the LORD hates, seven that are detestable to him: haughty eyes, a lying tongue, hands that shed innocent blood, a heart that devises wicked schemes, feet that are quick to rush into evil, a false witness who pours out lies and a person who stirs up conflict in the community." Human life is sacred and holy. It should be treated as such. Since we are created in God's image, anything that harms a human life reflects harming God himself. The article concludes that more should be done to make a change in this vaccine/abortion partnership. If more people were truly made aware of this unthinkable research, change would become a necessity on moral grounds. Father Richard John Neuhaus states "We should be afraid, very afraid, to join the company of those

who professionally guide the unthinkable on its passage through the debatable on its way to becoming the justifiable until it is finally established as the unexceptionable." "Did not he who made me in the womb make them? Did not the same one form us both within our mothers?" (Job 31:15)

With the vile ways these vaccines are made, I believe these immunizations completely violate the sanctity of life and this is something I will not be a part of. The connection between vaccines and abortion is something that cannot be denied. The process of using abortion- derived cell lines in production, testing or development of a vaccine is immoral in my Gods eyes and against my religious beliefs. A human life is formed at conception and denying a child its ability to develop is murder. The bible teaches us that God is intimately involved in forming human life, and through his creation the life is sacred. "Before I formed you in the womb I knew you, And before you were born I consecrated you; I have appointed you a prophet to the nations." (Jeremiah 1:5) "For you formed my inward parts; you knitted me together in my mother's womb." (Psalm 139:13) Any use of these cells derived from abortion is pure evil. This process is unacceptable and violates the sanctity of life, along with one of the most important Commandments. "You shall not murder." (Exodus 20:13) By supporting these acts, it would violate my moral conscience. Conscience is a strong force in Christianity. "When he listens to his conscience, the prudent man can hear God speaking." (CCC 1777). It is important to personally make moral decisions in all aspects of life. Man has the right to act in conscience and in freedom so as personally to make moral decisions. "He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters." (CCC 1782). Disobeying conscience is a sin and to disobey conscience is equivalent to damnation.

After the results I had found throughout my research, my wife and I began to research the vaccines that we had given our children. At this point we were not surprised but felt as if we had let our children down. We had also let ourselves down, because we had been given these same vaccines as well, without this prior knowledge. Never once did I suspect this was how vaccines were made. Society today teaches us that vaccines are universally accepted, and we failed to question it. We found out that many of these vaccines are derived from human lung fibroblasts (WI-38) or from a variety of different animal organs. Almost always, the chemicals listed for a vaccine are derived from an animal or human protein. https://cogforlife.org/wp-content/uploads/Aborted-Fetal-Cell-Line-Chart.pdf. This process is in direct conflict with my religious beliefs and violates the sanctity of the blood. This was extremely concerning because in nature, the different species should be kept separate. Animal cells should not contaminate our human blood. In our belief in God, we equate blood with our creator. Our blood should be kept pure because blood is life. To contaminate my blood would be to defile God's image. "For the life of the flesh is in the blood, and I have given it to you upon the altar to make atonement for your souls; for it is the blood that makes atonement for the soul. Therefore I said to the children of Israel, No one among you shall eat blood, nor shall

any stranger who dwells among you eat blood." (Leviticus 17:11-12) My interpretations of these scriptures forbid the tampering of the blood in my body. If God does not wish for me to eat the blood, he surely does not want the blood of an animal or another human entering my body. For my blood to remain pure, I must keep it the way God has intended. The blood of Jesus Christ both purifies the flesh and cleanses our conscience. I believe that because we accept Jesus' blood, it is our responsibility to keep it pure. The sanctity and purity of the blood is a strong message throughout the Bible. In Christianity, blood is considered sacred. It is to remain pure because without blood there is no life. The use of aborted fetal and animal cells to make vaccines will only corrupt and contaminate my blood. This is unacceptable to me because it betrays my faith in God.

These findings were a turning point in my family's life. I knew at this time that nothing would taint the blood of my family ever again. The guilt however, lasted quite some time. I knew I could not make up for what had been done, so I looked for answers. I went back to speak with Ms. Rosemary about my findings. I truly felt that I had betrayed God and my family. Ms. Rosemary guided me through scripture and allowed me to find my answers through Christ. His words spoke to me "I will instruct thee and teach thee in the way which thou shalt go; I will guide thee with mine eye." (Psalm 32:8). I met with my priest, and after an in-depth conversation, I confessed my sins and asked for forgiveness. Through penance, I was told to seek inner peace in God's word, with the help of the bible. This changed the way I worshipped through scripture. I read with a specific purpose and found new meaning within the text.

Many of these messages may not have resonated throughout previous readings, but with open eyes and open heart, I felt the love of God's grace. "For by grace you have been saved through faith. And this is not your own doing; it is the gift of God," (Ephesians 2:8).

Throughout my time with Ms. Rosemary and my renewed conviction to understanding the word of the Lord, I felt as God was speaking to me. I now believe that God, and God alone is my protector, my healer and all powerful. It is of the utmost importance to have faith and obey God's divine commandments. Throughout the bible, Jesus makes it clear to me that he will be there to shield me and heal me from anything that comes my way. "So that your faith might not rest on human wisdom but on the power of God." (1 Corinthians, 2:5). Immunization is the treatment of a healthy body. This is a direct contradiction to what the Bible states about going to the doctor. A visit to the doctor should only occur when sick. "Those who are well do not need a physician, but the sick do." (Mathew 2:17). In Mark 2:17, it reads "When Jesus heard it, he saith unto them, they that are whole have no need of the physician, but they that are sick." My trust and faith in the Heavenly Father is 100%. If I was to turn to immunizations, I would be turning my back on God. This is something I am unwilling to do. Exodus 15:26 states "If you diligently heed the voice of the Lord your God and do what is right in His sight, give ear to His Commandments and keep all His statues, I will none of the diseases on you which I brought on the Egyptians. For I am the Lord who heals you." For this reason, I believe that immunizations are a betrayal of my faith. I cannot put man before my God. If I want to live in God's likeness, I must trust in my all-powerful God.

There were various readings that I felt delivered a direct message to me in my time of need. None, more so than "No man can serve two masters: for either he will hate the one, and love the other; or else he will hold to the one, and despise the other. (Luke 16:13). From this I

knew that my faith in God is all or nothing. I cannot pick and choose when I want to follow in God's word. I must make decisions based on my own understanding of Christ.

To be clear, I am not against all medical interventions. However, I believe there is a clear difference between seeking help when you are sick, and intervention with a healthy body. Whatever God sends my way, I will pray for his guidance and let him guide my decisions as they relate to my personal belief in God.

Although the Pope has stated that it is permissible to receive the Covid vaccine, it does not change the fact that this will greatly discount my moral conscience and betray my faith in God. My sacred beliefs are connected only to my own personal interpretations of God's word. The Pope, although an important figure to the church is not my God. Through the many pages of the Bible, I am guided by Gods words and my conviction to faith is where I find the strength to make my decisions in life. The Vatican followed up the words of the Pope by stating that "vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary." I understand that because I reject all vaccines based on my personal religious beliefs, I must do my utmost to protect others around me. This is not something that I take lightly. I will continue to be proactive and care for the health of others as I complete my duties as a Lieutenant in the New York City Fire Department.

**FDNY's Denial**

64.     On December 16, 2021, FDNY denied Plaintiff's request for a religious accommodation to the Vaccine Mandate. The denial stated in pertinent part:

> The request for a religious exemption from the vaccine mandate is denied. The asserted basis for the accommodation is insufficient to grant the requested accommodation in light of the potential undue hardship to the Department.

65.     This was a boilerplate denial which all FDNY employees who were denied religious accommodations received.

66.     The FDNY did not communicate with Plaintiff regarding his request for religious accommodation before issuing this denial.

67.     The FDNY did not find Plaintiff's religious beliefs to be insincere.

68.     The FDNY did not ask Plaintiff any questions about the sincerity of his religious beliefs.

69.     The sole reason for the FDNY's denial was undue hardship.

70.     The FDNY considered whether an accommodation presented an undue hardship on FDNY operations using the "more than a de minimis" standard.

11

71.     The FDNY's policy was to deny accommodation requests without communicating with applicants.

72.     The FDNY unilaterally deemed further information would not change the outcome of an accommodation request, and thus denied requests without any communication.

73.     The FDNY's denial of religious accommodation requested based on a potential for undue hardship is attributable to animosity to religion.

74.     The FDNY granted medical accommodations on more favorable terms than religious accommodations.

75.     Specifically, medical accommodations were evaluated and granted without considering any undue hardship.

76.     Defendants had a lower bar for denying religious exemptions as opposed to medical exemptions.

77.     However, religious accommodations were pretextually denied based on alleged undue hardship.

78.     The denial Plaintiff received was a boilerplate letter sent to many other FDNY employees who were also denied religious accommodations.

79.     But the FDNY *did* grant religious accommodations to some FDNY firefighters and fire officers.

80.     Those firefighters and fire officers were permitted to work while submitting to weekly PCR testing.

81.     The FDNY had attorneys from the General Law Unit ("GLU") reviewing and deciding on reasonable accommodation requests to the Vaccine Mandate.

82.     These GLU attorneys did not have experience deciding reasonable accommodations.

83.     The GLU attorneys did not decide reasonable accommodations as part of their job duties.

84.     The FDNY failed to consider less restrictive measures that would stem the spread of COVID-19.

85.     The FDNY considered only weekly PCR testing as the sole potential accommodation for Plaintiff.

86.     The FDNY did not try to accommodate Plaintiff in any other way.

87.     The FDNY did not explore any other options.

88.     The FDNY then ruled out weekly PCR testing without reason, despite granting this same accommodation to other similarly situated firefighters and fire officers.

89.     On January 7, 2022, due to a request from Plaintiff's union for more information concerning the reasons for the boilerplate denials that union members received, the FDNY sent out a letter that stated: "In response to requests for further information concerning the reasons for the denial, the Department is providing this supplemental letter." The supplemental letter, added one sentence to the previous denial letter: "Given the state of the public health emergency, the nature of the Department's life-saving mission, and the impact to the safety and health of Department members and the public that Department members regularly interact with, the requested accommodation could not be granted."

**Appeal to the Citywide Panel**

90.     On December 20, 2021, Plaintiff timely appealed the FDNY's denial of his religious accommodation request to the Citywide Panel.

91.     In response to the FDNY's denial reason of potential undue hardship, Plaintiff wrote in his appeal letter, in pertinent part: "The process of allowing city workers to vaccinate or test weekly was an effective, less intrusive means of achieving the same protection. This order allowed employees to not only ensure the safety of others, but to exercise their deeply held religious beliefs. I have been willing to comply with this arrangement since the beginning and have not become infected with COVID or any other contagious disease. I have and will continue to comply with the weekly testing requirement as originally issued."

92.     The City formed the Citywide Panel in order to adjudicate appeals of Reasonable Accommodation Requests to the Vaccine Mandate that were denied at the agency level.

93.     The Citywide Panel functioned as an appeals body.

94.     The Citywide Panel reviewed denials of reasonable accommodation requests based solely on the existing record.

95.     The Citywide Panel did not conduct independent fact-finding.

96.     The appeal record for Plaintiff included: (1) his religious accommodation request, including the form, personal statement, and letter of support, (2) the FDNY's original denial letter and letter with supplemental information, and (3) Plaintiff's appeal statement.

97.     The FDNY did not provide any information to the Citywide Panel on undue hardship outside of what was indicated in the denial letter itself.

98.     The Citywide Panel is made up of three voting members who handled the denials of religious accommodation appeals.

99.     A final disposition on an appeal required votes from all three members, with a 2-1 majority prevailing in the event of a disagreement.

**The City's Policies on Reasonable Accommodations to the Vaccine Mandate**

100.    The City implemented standards, procedures, and policies for the City agencies, including the FDNY, to use while evaluating and deciding religious accommodations to the Vaccine Mandate.

101.    The City promulgated many of its policies, procedures, and standards regarding the Vaccine Mandate through the Department of Citywide Administrative Services ("DCAS").

102.    DCAS instructed the various city agencies, including the FDNY, on the policies, procedures, and standards regarding religious accommodations to the Vaccine Mandate.

103.    These standards, procedures, and policies for evaluating and deciding religious accommodation requests to the Vaccine Mandate disfavored Catholics, including Plaintiff.

104.    Defendant's accommodation standards, procedures, and policies provided that there was no valid basis for a Catholic to refuse the COVID-19 vaccine.

105.    Defendant's accommodation standards, procedures, and policies provided that Catholics should be denied religious accommodations to the Vaccine Mandate.

106.    When deciding accommodation requests, it was the Defendant's policy and procedure to deny applicants based on the publicly expressed religious views of what the Defendants' considered the leader of the applicants' faiths.

107.    It was Defendant's policy and procedure to deny applicants whose religious opposition to the COVID-19 vaccine was not deemed to be central to their faiths.

108.    It was Defendant's policy and procedure to deny applicants where the Defendants' decided that the applicant's opposition was not required by his faith because other members of the faith did not oppose the vaccine.

109.    It was Defendant's policy and procedure to deny applicants who opposed the COVID-19 vaccine based on an opposition to abortion.

110.    It was Defendant's policy and procedure to deny the validity of Catholic applicants' interpretations of their faith and refuse to recognize a religious belief in opposition to the Vaccine Mandate for Catholic applicants.

111.    Defendant's accommodation standards, procedures, and policies provided that applicants, including Plaintiff, who objected to the COVID-19 vaccination based upon a religious objection to abortion should be denied.

112.    The Defendant's employees charged with reviewing and deciding requests for religious accommodations had total discretion over whether to grant those requests.

113.    Sometimes these decision makers strictly adhered to the standards, policies and procedures implemented by the City.

114.    Other times, the decision makers ignored the City's standards, policies, and procedures.

115.    Defendants refused to accommodate Plaintiff's religious beliefs because his objection to the COVID-19 vaccination was based upon that the vaccination was created and developed using aborted fetal cell lines.

116.    Defendants refused to acknowledge an objection based upon the COVID-19 vaccination's connection with aborted fetal cell lines.

117.    Defendants' policy was to deny requests for accommodations based upon objections based on the applicant's belief that the vaccines were created using aborted fetal cell lines because Defendants considered these beliefs to be "inaccurate".

118.    The City instructed its agencies, including the FDNY, to deny requests for religious accommodations that were made based on a religious objection to abortion.

119. Defendant unlawfully considered the verity and accuracy of Plaintiff's religious beliefs and denied him because they disagreed with him.

120. Defendant also refused to accommodate Plaintiff's religious beliefs because he identified as a Catholic.

121. The City categorically denied religious accommodation requests from individuals identifying as Catholic, presuming that their objections were invalid if their religious leaders did not officially oppose the vaccine.

122. The City evaluated the validity of applicants' religious objections by determining whether their beliefs aligned with official doctrine from their religious institutions, effectively choosing which interpretations of religious doctrine to recognize.

123. The Defendants concluded that because the Pope permits Catholics to receive the vaccine, Plaintiff could not sincerely hold a religious belief opposing vaccination.

124. The Defendant's policies provided that Catholics could not "qualify as a religious belief" because the rejection of the COVID-19 vaccine based on its connection to abortion was not "part of a comprehensive religious belief system" because other Catholics accepted the COVID-19 vaccine.

125. The Defendant's considered Catholic applicants, including Plaintiff, who objected to the COVID-19 vaccine to have "personal beliefs" which were not required by the tenets of Catholicism.

126. And on this basis, the Defendants denied Catholic applicants, including Plaintiff, religious accommodations to the Vaccine Mandate.

127. But Defendants approved religious accommodations for Christian Scientists and Jehovah's Witnesses.

128.     This is because Defendants viewed refusal of vaccination to be central to those faiths, but not central to Catholicism.

129.     The City's accommodation policy disproportionately impacted members of certain religious groups, particularly Catholics, whose applications were more likely to be denied based on the City's reliance on official statements from religious leaders.

130.     The City summarily denied religious accommodation requests without conducting a meaningful inquiry into the sincerity of the Plaintiff's religious beliefs, instead applying a blanket standard that presumed such beliefs to be insincere or invalid based on the City's view of the connection between the vaccine and abortion.

131.     The Defendants considered the public comments made by those they considered the religious leaders of applicants' religions when deciding religious accommodation requests.

132.     The Defendants drew arbitrary distinctions about whether opposition to a vaccine tested on aborted fetal cell lines constituted a valid religious objection, asserting that the Plaintiff's beliefs were invalid because they stemmed from opinions expressed by others in their faith community.

133.     The City denied Plaintiff's request for a religious accommodation after concluding that Plaintiff's religious opposition to the COVID-19 vaccine, due to its connection to aborted fetal cell lines, was invalid because the connection was "too remote."

134.     In doing so, the City substituted its own assessment of moral culpability for the Plaintiff's sincerely held religious belief.

135.     In processing accommodation requests, the City required applicants to provide detailed theological explanations for their beliefs and assessed the reasonableness of these beliefs, fostering excessive entanglement between the government and religious doctrine.

136.    The City's accommodation policy, as applied, automatically denied religious accommodation requests from individuals identifying as Catholic, on the grounds that the Catholic Church does not officially prohibit the vaccine.

137.    The City did not investigate or consider the individual's sincerely held beliefs, instead relying on a blanket policy that dismissed objections rooted in Catholic teachings about abortion.

138.    The City favored certain interpretations of Catholic teachings, accepting vaccine compliance as consistent with Catholic doctrine while rejecting individual Catholics' interpretations of their religious obligations.

139.    This created a preference for one religious viewpoint over another within the same faith tradition.

140.    In adjudicating religious accommodation requests, the City evaluated religious beliefs through the lens of its own policy definitions and thresholds, imposing a standard of reasonableness and alignment with organizational or denominational positions that effectively excluded claims from individuals who did not meet these criteria.

141.    This discriminated against Catholics like Plaintiff, who automatically were disqualified from receiving a religious exemption on this basis.

142.    The City's application of its accommodation policies disproportionately impacted Catholic applicants by denying all requests from Catholics who cited religious objections to the vaccine's connection to abortion, without considering the sincerity of their individual beliefs.

143.    The City denied religious accommodations en masse for individuals who identified with specific faith traditions, including Catholicism, based on its presumption that

members of these faiths could not sincerely object to the vaccine if their religious leaders did not explicitly forbid it.

144. The City determined that objections to the vaccine based on its development or testing using aborted fetal cell lines were invalid if the applicant did not also state explicit objections to other products that the City deemed to have been tested in similar ways, without even asking the applicant about any other products.

145. The City automatically presumed that applicants used over-the-counter medications and received other vaccinations if their applications did not explicitly address these matters, even though the City never instructed applicants to provide such information.

146. The City made automatic negative assumptions about applicants who objected to the COVID-19 vaccine based upon its development or testing using aborted fetal cell lines, including that those applicants must reject other over-the-counter medications and other vaccinations.

147. The City presumed that applicants' use of over-the-counter medications or other vaccines necessarily violated their religious beliefs in the same way as the COVID-19 vaccine, without considering that these products may have been tested on fetal cell lines by third parties after their creation, not by their manufacturers as part of their development or production.

148. The City ignored the nuanced nature of religious beliefs, assuming that an applicant who objected to the COVID-19 vaccine on the basis of its direct development and testing using fetal cell lines would necessarily hold the same objection to certain over-the-counter medications that may have been tangentially connected through independent, post-production testing.

149.     The City's denial of religious accommodations relied on an unsupported presumption of inconsistent conduct by applicants, failing to recognize that an applicant can sincerely distinguish between complicity in the development and production of a product versus its incidental use after the fact.

150.     The City did not even consider what the applicant, including the Plaintiff, knew to be true or was aware of regarding any alleged connection between abortion and over-the counter medications.

151.     By presuming that applicants who used over-the-counter medications or other vaccines were acting inconsistently with their religious beliefs, the City effectively dismissed the sincerity of applicants' objections without conducting an individualized assessment of their knowledge, beliefs, or intent.

152.     The City never provided applicants with specific instructions to disclose their use of over-the-counter medications or other vaccines, yet presumed that any omission of such information indicated insincerity or inconsistency in their religious objections.

153.     By accepting religious objections only if they met specific, City-defined criteria, the City endorsed certain religious interpretations while dismissing others, effectively favoring particular religious viewpoints.

154.     The City's refusal to recognize legitimate religious objections coerced employees into receiving the vaccine despite their deeply held religious beliefs, under threat of termination or placement on Leave Without Pay.

155.     Defendants denied Plaintiff's religious accommodation request because they relied upon public statements by the Pope.

156.     Defendants did not have any objective basis to doubt the sincerity of Plaintiff's religious beliefs regarding COVID-19 vaccines.

157.     Defendants did not have any objective basis to doubt the religious nature of Plaintiff's religious beliefs regarding COVID-19 vaccines.

158.     Defendants never communicated to Plaintiff that his sincerity or the religious nature of his objection was in question.

159.     Defendants did not ask Plaintiff any questions about his reasonable accommodation request.

160.     The Defendants had unchecked authority in determining which religious beliefs merit accommodation.

161.     It was the Defendants' policy to reject applicants' religious beliefs if they were based on abortion.

162.     The Defendants' denied applicants who made abortion-based objections to the COVID-19 vaccine and judged these beliefs as inaccurate and implausible.

163.     The Defendants refused to accept the validity of applicant's individual interpretations of their religious creeds.

164.     The Defendants denied applicants if they did not show that refusal of vaccination was mandated by their religion.

165.     Defendants refused to acknowledge a "conflict" where an applicant's religion did not explicitly require the refusal of vaccines.

166.     The Defendants' accommodation policies only allowed for religious accommodations for applicants who were members of religions that they deemed recognized and established religious organizations with longstanding objections to all vaccination.

167.    And the Second Circuit found the standards the City used in deciding religious accommodation requests to the Vaccine Mandate for teachers were neither generally applicable nor neutral, and did not "survive strict scrutiny". *Kane v. De Blasio*, 19 F.4th 152, 169 (2d Cir. 2021). The Second Circuit held that the City's policies violated the Free Exercise Clause, specifically rejecting the requirements that exemption requests be considered only for recognized and established religious organizations, and that requests be denied if the religious leader supports the vaccine, if documentation is readily available online, or if the objection is personal, political, or philosophical. *Id.* at 168–69.

168.    Wildly, the City failed to disavow this policy, and expanded it as an official written option to many different City agencies, *after* the Second Circuit determined it was unconstitutional.

169.    For example, in the case of a Catholic New York City Police Detective who applied for a religious accommodation to the Vaccine Mandate based upon the use of aborted fetal cell lines and his religious opposition to abortion based upon his Catholic faith, the City rejected his religious objection, stating that his "claims, including that taking the currently available vaccines would violate principles of his Catholic faith, are not based in the very religion to which he allegedly maintains a sincerely held religious belief." *Furno v. New York City Police Dep't*, Index No. 85021/2023, NYSCEF Doc. No. 31, March 2, 2023, at p. 16. The City explained:

> Petitioner claims he is a "conscientious and devout Catholic" and that he "cannot in good conscience accept a vaccine, which employs cell lines derived from aborted fetuses as it violates fundamental aspects of his Catholic faith." Yet Petitioner ignores the reality that the Catholic faith, as attested to by the Sovereign Pontiff Francis ("Pope Francis") advocates for vaccination against COVID-19. Pope Francis has explicitly stated that the COVID-19 vaccine is "authorized by the respective authorities" and is an "act of love." Indeed, Pope Francis himself, arguably Catholicism's most prominent physical embodiment of the "Holy Spirit" of concern to Petitioner herein, has been vaccinated

23

against COVID-19. Moreover, the Vatican's Congregation for the Doctrine of the Faith stated, "It is morally acceptable to receive COVID-19 vaccines that have used cell lines from aborted fetuses in their research and production process," and further, "all vaccinations recognized as clinically safe and effective can be used in good conscience with the certain knowledge that the use of such vaccines does not constitute formal cooperation with the abortion from which the cells used in production of the vaccines derive, which statements were "explicitly approved by Pope Francis."

*Id.* at p. 15-16.

170.    And the undue hardship policy was more generous for those who qualified under the overtly discriminatory policy.

171.    The Defendants' decision-makers on reasonable accommodation requests continued to use these standards to decide requests, including the Plaintiff's request.

**Citywide Panel Denial**

172.    On March 9, 2022, the Citywide Panel denied Plaintiff's request for a religious accommodation to the Vaccine Mandate.

173.    The Citywide Panel never communicated with Plaintiff outside of the denial letter he received.

174.    The Citywide Panel never asked Plaintiff for any information regarding his history of vaccination or medication refusal.

175.    A history of vaccination or medication refusal is not required to qualify for a religious accommodation to the Vaccine Mandate.

176.    The Citywide Panel's denial letter did not provide any reason or rationale for the denial.

177.    The Citywide Panel denied the Plaintiff based on undue hardship.

178.    The Citywide Panel did not find Plaintiff's religious beliefs to be insincere.

179.     The Citywide Panel did not ask Plaintiff any questions about the sincerity of his religious beliefs.

180.     The Citywide Panel did not consider any potential accommodations as this was the role of the FDNY.

181.     Defendants had no objective basis for questioning the religious nature of Plaintiff's religious beliefs.

182.     Defendants had no objective basis for questioning the sincerity of Plaintiff's religious beliefs.

183.     Plaintiff sufficiently articulated and explained the religious nature of his conflict with the Vaccine Mandate.

184.     Defendants summarily denied Plaintiff's request for accommodation without any individualized consideration.

185.     Defendants did not consider Plaintiff's individual job duties before refusing to accommodate him.

**Constructive Termination**

186.     The denial letter from the Citywide Panel stated that Plaintiff had three days to submit proof of receipt of the first dose of the COVID-19 vaccine or he would be placed on Leave Without Pay.

187.     Plaintiff was being placed on Leave Without Pay because his religious accommodation request was denied.

188.     Employees who did not comply with the Vaccine Mandate were placed on Leave Without Pay and then terminated.

189. The day after he received the denial from the Citywide Panel, on March 10, 2022, Plaintiff applied for a vested separation from the FDNY.

190. Handing in his vested separation paperwork caused Plaintiff immense grief.

191. Plaintiff cried on the rig that night, feeling like he was living in a nightmare.

192. Plaintiff was constructively terminated.

193. Plaintiff was facing certain placement on Leave Without Pay on March 12, 2022.

194. Plaintiff was facing imminent termination.

195. Plaintiff did not have the twenty years of service needed to retire.

196. By entering into a vested separation, Plaintiff forfeited terminal leave.

197. By entering into a vested separation, Plaintiff forfeited the variable supplement.

198. By entering into a vested separation, Plaintiff forfeited reserve for increased take-home pay.

199. By entering into a vested separation, Plaintiff forfeited other benefits he would have received such as medical benefits.

200. Plaintiff also lost suffered considerable financial losses due to the vested separation.

201. Plaintiff planned on working for the FDNY for at least thirty years before retiring with a full retirement.

202. Plaintiff felt he had no choice but to enter into a vested separation.

203. Plaintiff's vested separation date was April 10, 2022.

**Undue Hardship**

204. The Defendants cannot demonstrate that providing a reasonable accommodation to the Vaccine Mandate would cause an undue hardship, particularly where the FDNY accommodated other employees' religious beliefs.

205. The FDNY granted religious and medical accommodations to FDNY employees by allowing those employees to submit weekly PCR testing.

206. The FDNY granted at least six (6) religious exemptions to the Vaccine Mandate to FDNY firefighters and fire officers.

207. These firefighters and fire officers were permitted to submit to weekly PCR testing instead of receiving the COVID-19 vaccine.

208. The FDNY granted at least twenty-nine (29) medical exemptions to the Vaccine Mandate to FDNY firefighters and fire officers.

209. These firefighters and fire officers were permitted to submit to weekly PCR testing instead of receiving the COVID-19 vaccine.

210. The FDNY promulgated a "Buckslip and Memo" to employees, including Plaintiff, outlining the procedures regarding the City's COVID-19 Vaccine Mandate.

211. The Memo stated: "Employees who are awaiting determination on a reasonable accommodation request submitted on or before October 27 or who were granted a reasonable accommodation will be required to submit to weekly testing."

212. The Defendants permitted over 1,176 FDNY employees to submit to weekly testing while their reasonable accommodation requests and appeals were pending.

213. The 1,176 employees who were permitted to continue working unvaccinated included full duty fire fighters and fire officers.

214.    Plaintiff himself was permitted to continue working unvaccinated while submitting weekly PCR testing from October 2021 through March of 2022.

215.    The Memo specified that accommodated FDNY employees would "submit a weekly negative test instead of submitting proof of vaccination" to FDNY Human Resources.

216.    As of January 11, 2022, the FDNY granted approximately 105 reasonable accommodations to the COVID-19 Vaccine Mandate.

217.    Defendants granted decision-makers reviewing religious accommodation requests substantial discretion in determining whether to approve or deny such requests.

218.    The City allowed the individual decision-makers to exercise broad, subjective judgment.

219.    This broad discretion enabled decision-makers to impose their own personal or ideological biases when assessing the validity of religious objections and the assumed dangers of being unvaccinated, leading to arbitrary and inconsistent outcomes.

220.    Even active-duty firefighters and fire officers were accommodated with weekly PCR testing.

221.    These accommodated firefighters and fire officers had contact with the public.

222.    These accommodated firefighters and fire officers had contact with their colleagues.

223.    These accommodated firefighters and fire officers slept in the firehouse.

224.    And New York City Police Department employees were also accommodated with weekly PCR testing.

225.    This included active-duty police officers who responded to emergencies, had contact with the public and other members of the NYPD.

226.    The Defendant could have accommodated Plaintiff with weekly PCR testing.

227.    Weekly testing was provided as the standard reasonable accommodation to the Vaccine Mandate.

228.    The Defendant failed to consider any accommodations, or less restrictive means of reducing the spread of COVID-19, outside of vaccinations.

229.    The City promulgated guidance titled "Managing the Office in the Age of COVID-19", which provided guidance on many risk mitigation strategies to reduce the risk of COVID-19 transmission.

230.    These mitigation strategies included ventilation interventions recommended by the Centers for Disease Control & Prevention ("CDC").

231.    These mitigation strategies included cleaning and disinfection strategies recommended by the CDC.

232.    These mitigation strategies included face covering, also known as masking.

233.    These mitigation strategies included health screenings.

234.    These mitigation strategies included using disinfecting and cleaning procedures recommended by the Centers for Disease Control & Prevention.

235.    These mitigation strategies included using ventilation interventions recommended by the Centers for Disease Control & Prevention.

236.    The Defendant failed to consider any mitigation strategies as less restrictive measures that could have been taken to reduce the transmission of COVID-19.

237.    Additionally, the FDNY promulgated an Equal Employment Opportunity Policy that listed job reassignments and lateral transfers as examples of ways to accommodate an employee's religious observance, practice, or belief.

238.    The Defendant did not consider a temporary job reassignment or lateral transfer as a less restrictive way of accommodating Plaintiff's religious practices.

239.    The Defendant did not consider putting Plaintiff on Light Duty temporarily, as a less restrictive means of reducing the transmission of COVID-19.

240.    The Defendant did not consider putting Plaintiff offline (in a position outside of the firehouse) temporarily as a less restrictive means of reducing the transmission of COVID-19.

241.    Although Defendant had numerous less restrictive means of achieving its objectives that were readily available, the Defendants failed to examine any of these less restrictive means.

242.    The Defendant cannot demonstrate that providing a reasonable accommodation to the Vaccine Mandate would cause an undue hardship, particularly where the Vaccine Mandate only required employees to receive the initial dose(s) of the COVID-19 vaccination and did not require any subsequent booster shots.

243.    The COVID-19 vaccine does not cause prevention or transmission of the COVID-19 virus.

244.    On July 27, 2021, the Centers for Disease Control and Prevention ("CDC") promulgated guidance that stated that "[v]accinated people can still become infected and spread the virus to others." *Science Brief: COVID-19 Vaccines and Vaccination*, Centers for Disease Control and Prevention, Last Updated July 27, 2021, www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html (last accessed September 1, 2021).

245.    And on July 30, 2021, CDC Director Rochelle P. Walensky, MD, MPH issued a public statement regarding similar viral loads that vaccinated and unvaccinated people infected with COVID-19 demonstrated:

On July 27, CDC updated its guidance for fully vaccinated people, recommending that everyone wear a mask in indoor public settings in areas of substantial and high transmission, regardless of vaccination status. This decision was made with the data and science available to CDC at the time, including a valuable public health partnership resulting in rapid receipt and review of unpublished data.

Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus. This finding is concerning and was a pivotal discovery leading to CDC's updated mask recommendation. The masking recommendation was updated to ensure the vaccinated publix would not unknowingly transmit virus to others, including their vaccinated or immunocompromised loved ones.

*Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, Centers for Disease Control and Prevention, July 30, 2021, available at

www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html.

246.    On or about February 9, 2023, the New York City Department of Health and Mental Hygiene amended the Vaccine Mandate, no longer requiring exclusion from the workplace for City Workers who do not provide proof of COVID-19 vaccination.

247.    The Defendants fired Plaintiff over a temporary work requirement that Defendants would be rescinding anyway.

**Emotional and Financial Devastation**

248.    Defendants' actions caused Plaintiff to suffer immense pain and suffering, including but not limited to shame, grief, anxiety, depression, headaches, exhaustion, and feelings of worthlessness.

249.    Additionally, Plaintiff suffered significant financial distress. In addition to losing his salary (including overtime), Plaintiff lost benefits and pension, including accumulated leave time.

250.    Plaintiff's unlawful discriminatory acts caused catastrophic emotional, psychological, and financial harm, uprooting every aspect of his life and inflicting suffering that continues to this day.

251.    Firefighting was more than a job for Plaintiff—it was his passion, his calling, and a central part of his identity.

252.    The firehouse was his second family, and his forced departure was akin to losing 40-50 family members overnight.

253.    The brotherhood, camaraderie, and sense of purpose he built over years of dedicated service were stripped from him in an instant, leaving a deep and immeasurable void.

254.    Plaintiff was proud to serve as a firefighter and looked forward to every shift.

255.    Being forced to leave the FDNY against his will left him lost, disconnected, and searching for meaning.

256.    No other profession has been able to replace the sense of fulfillment that firefighting gave him.

257.    The impact on Plaintiff's mental and emotional health has been profound.

258.    He struggles with feelings of isolation, anxiety, and depression.

259.    He has described his experience as being thrown into a hole, only for the ground beneath him to keep collapsing, making it impossible to climb out.

260.    His sleep has suffered, with persistent insomnia and restless nights spent consumed by worry.

261.    The immense stress and anxiety of being forced to choose between his faith and his career took a severe toll on Plaintiff's physical and mental health, causing him to lose over 20 pounds as he grappled with the overwhelming fear of an uncertain future.

262.     The pain extends beyond Plaintiff.

263.     His wife and children have suffered as well, enduring emotional distress, uprooted from their home, and forced to leave behind their friends, schools, and extended family.

264.     Plaintiff's youngest son, who once beamed with pride visiting the firehouse, continues to ask when they can return, unaware that the answer is never.

265.     The emotional distress this has caused Plaintiff as a father and husband is immeasurable.

266.     The financial devastation has been equally crippling. Plaintiff was forced into early retirement, losing nearly two-thirds of his income.

267.     His pension benefits were drastically reduced, forcing his family into an unfamiliar and distressing financial reality. The stability they once relied on was shattered.

268.     Plaintiff and his wife were forced to sell their home in New York, uprooting their family and moving to Florida in search of a more affordable cost of living.

269.     The move itself was an overwhelming financial and emotional burden.

270.     The rush to sell their home, purchase a new one, and relocate an entire household to a state where they had no established support system created significant stress and anxiety.

271.     The move strained every facet of Plaintiff's family life.

272.     His children struggled to adjust to a new school and community, missing the stability and familiarity of their home.

273.     Plaintiff's marriage suffered under the weight of financial hardship and the emotional turmoil of losing their home, support system, and way of life.

274.     In addition to the emotional toll, Plaintiff incurred substantial financial losses due to his forced relocation, including the costs of selling his home in New York, purchasing a new

home in Florida, moving expenses, and the logistical challenges of uprooting his entire family on short notice—all of which compounded the financial strain caused by his sudden loss of income.

275.     The financial strain became so severe that Plaintiff's wife was forced to file for bankruptcy—only for the case to be dismissed because they could not afford the required payments.

276.     To try and provide for his family, Plaintiff transitioned to a job as a teacher.

277.     Despite having a bachelor's and master's degree in education, the shift was overwhelming.

278.     Teaching did not bring the same fulfillment, and the drastic pay cut left him in a state of constant financial distress.

279.     He struggled to sleep, waking up at 2 AM nightly, his mind racing with anxiety over how to provide for his wife and children.

280.     The financial burden has continued to compound.

281.     In addition to the loss of his salary and pension benefits, Plaintiff is forced to spend money he does not have on medical, dental, and vision insurance, HSA/FSA contributions, and dependent care expenses—costs that would have been fully covered had he been allowed to remain with the FDNY.

282.     Plaintiff's children have suffered deeply.

283.     They lost the ability to participate in sports, martial arts, and activities they once loved due to financial constraints.

284.     They no longer have easy access to their grandparents, aunts, uncles, and cousins, causing further emotional distress and a sense of isolation.

285.     Plaintiff also struggles with being away from his extended family.

286.     His oldest son, in particular, has struggled with social issues since the move, requiring counseling and therapy to help him cope.

287.     Plaintiff has also been forced to watch his aging parents decline in health from a distance, unable to be there for them as he once was.

288.     While he used to live just five minutes away and saw them multiple times a week, he now sees them only a handful of times per year, a heartbreaking consequence of his forced displacement.

289.     Plaintiff carries the unbearable weight of knowing that, as a husband and father, he could not shield his family from the financial hardship, emotional turmoil, and upheaval they have endured.

290.     The helplessness of watching his wife struggle with anxiety and depression, his children grieve the loss of their home and stability, and his family's once-secure future unravel has been an agony greater than any physical pain he has ever known.

291.     The financial and emotional devastation has been compounded by the knowledge that Plaintiff's career and future were stolen from him. Plaintiff had dedicated over three and a half years of rigorous study toward advancing to Captain, with the ultimate goal of rising to Chief and retiring after a 30-year career. Instead, that dream was ripped away.

292.     Plaintiff's religious beliefs were not only ignored but actively used against him, resulting in his ostracization, isolation, and termination.

293.     The City's actions forced him to choose between his faith and his career—an impossible decision that took an immense mental, emotional, and physical toll, even causing him to lose over 20 pounds from stress and anxiety during the ordeal.

294. Plaintiff's suffering has been all-encompassing. The emotional pain of losing his purpose, the financial devastation of losing his livelihood, and the strain placed on his marriage, children, and extended family have left wounds that may never fully heal.

295. Despite all of this, Plaintiff has clung to his faith, believing that this is a test he must endure.

296. He has sacrificed everything—his career, financial security, his home, and his dreams—because of his convictions.

297. The City's refusal to accommodate his religious beliefs has caused irreparable harm, and Plaintiff continues to suffer as a direct result of Defendants' unlawful actions

## CLAIMS

## FIRST CAUSE OF ACTION

### (Violation of the Free Exercise Clause of the
### First Amendment of the United States Constitution)

298. Plaintiff reincorporates all preceding and subsequent statements set forth in this Complaint as if fully written herein.

299. The First Amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I.

300. The Free Exercise Clause of the First Amendment prohibits government entities from burdening a sincerely held religious belief unless the law or policy is neutral, generally applicable, and satisfies strict scrutiny.

301. Plaintiff's sincerely held religious beliefs prohibit him from receiving the COVID-19 vaccine.

302.     Defendants' Vaccine Mandate and the denial of Plaintiff's request for a reasonable accommodation substantially burdened his religious exercise, coercing him to violate his beliefs or face unpaid leave and termination.

303.     Defendants' policy was neither neutral nor generally applicable, as they discriminated against Catholics, granted secular accommodations more readily than religious ones, failed to apply consistent standards, and allowed unvaccinated employees to work under various exceptions while denying Plaintiff's request.

304.     Defendants' actions were not the least restrictive means of furthering a compelling government interest, as they failed to consider alternative accommodations such as weekly testing, which was provided to other employees.

305.     As a result, Defendants violated Plaintiff's constitutional rights, causing him economic, emotional, and reputational harm, in an amount to be proven at trial.

306.     Plaintiff is entitled to declaratory and injunctive relief, compensatory damages including pain and suffering, and attorney's fees under 42 U.S.C. § 1988., in an amount to be proven at trial.

### SECOND CAUSE OF ACTION

**(Failure to Accommodate in Violation of the New York City Human Rights Law)**

307.     Plaintiff reincorporates all preceding and subsequent statements set forth in this Complaint as if fully written herein.

308.     At all relevant times, the NYCHRL has been in full force and effect and has applied to Defendants' conduct.

309.     Pursuant to the NYCHRL,

It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate, or forego a practice of, such person's creed or religion, … and the employer shall make reasonable accommodation to the religious needs of such person.

N.Y.C. Admin. Code § 8–107(3)(a).

310.     At all relevant times, the Defendants had the power to hire, promote, and discharge Plaintiff.

311.     Plaintiff has sincerely held religious beliefs which conflict with receiving the COVID-19 vaccines.

312.     The Defendants required Plaintiff to receive the COVID-19 vaccine to retain his employment.

313.     However, vaccination is not a condition of employment for those who are eligible for a religious or medical accommodation.

314.     Plaintiff requested a reasonable accommodation to the Defendants' requirement that he receive the COVID-19 vaccination based on his sincerely held religious beliefs.

315.     Defendants denied Plaintiff's request for a religious accommodation.

316.     Defendants failed to provide Plaintiff with a reasonable accommodation of his religious observance, practice, and belief (i.e., that he cannot take the COVID-19 vaccine), which precludes him from complying with the Vaccine Mandate.

317.     The Defendants unlawfully considered Plaintiff's accommodation request using the incorrect standard for undue hardship: the "more than a de minimis" standard.

318.     Plaintiff was able to perform the essential duties of his job with a reasonable accommodation.

319. Plaintiff vaccination status did not prevent him from fulfilling the obligations of his position.

320. Accommodating Plaintiff would not require significant expense or difficulty from the Defendants.

321. Accommodating Plaintiff would not significantly interfere with the safe or efficient operation of the Defendants' workplace.

322. Accommodating Plaintiff would not require Defendants to violate a bona fide seniority system.

323. Defendants cannot demonstrate that accommodating Plaintiff would cause an undue hardship.

324. Instead of accommodating Plaintiff's religious beliefs, Defendants constructively terminated Plaintiff because he could not receive the COVID-19 vaccination.

325. Defendants discriminated against Plaintiff's religious beliefs.

326. As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiff has suffered, and continues to suffer, substantial losses, including but not limited to the loss of past and future earnings, compensation and benefits, increases, promotions, bonuses, pension, and other employment benefits, for which Plaintiff is entitled to an award of monetary damages which will be determined at trial, and other relief.

327. As a direct and proximate result of Defendant' failure to accommodate, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which Plaintiff is entitled to an award of monetary damages in an amount to be determined at trial.

328.     As a direct and proximate result of Defendants' failure to accommodate, Plaintiff is thus entitled to injunctive and declaratory relief, as well as compensatory damages, including pain and suffering, for the injuries and loss sustained as a result of Defendants' unlawful discriminatory conduct under the NYCHRL, in an amount to be determined at trial.

329.     Plaintiff is further entitled to an award of attorney's fees, expert fees, and other costs under the NYCHRL. N.Y.C. Admin. Code §8-502(g).

### THIRD CAUSE OF ACTION

**(Failure to Accommodate in Violation of the NYSHRL)**

330.     Plaintiff reincorporates all preceding and subsequent statements set forth in this Complaint as if fully written herein.

331.     At all relevant times, the NYSHRL has been in full force and effect and has applied to Defendants' conduct.

332.     The NYSHRL provides:

It shall be an unlawful discriminatory practice for any employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion, including but not limited to the observance of any particular day or days or any portion thereof as a sabbath or other holy day in accordance with the requirements of his or her religion or the wearing of any attire, clothing, or facial hair in accordance with the requirements of his or her religion, unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business.

N.Y. Executive Law § 296(10)(a).

333.     "Undue hardship" is defined as "an accommodation requiring significant expense or difficulty (including significant interference with the safe or efficient operation of the workplace…)." N.Y. Executive Law § 296(10)(d).

334.    At all relevant times, the Defendants were employers of Plaintiff.

335.    Plaintiff has sincerely held religious beliefs which prohibit him from receiving the COVID-19 vaccines.

336.    The Defendants required Plaintiff to receive the COVID-19 vaccine to retain his employment.

337.    Plaintiff requested a reasonable accommodation to the Defendants' requirement that Plaintiff receive the COVID-19 vaccination.

338.    Defendants discriminated against Plaintiff's religious beliefs and practice.

339.    Defendants denied Plaintiff's request for a reasonable accommodation.

340.    Defendants failed to provide Plaintiff with a reasonable accommodation of Plaintiff's religious observance, practice, and belief (i.e., refusing the COVID-19 vaccine), which precludes Plaintiff from complying with the Vaccine Mandate.

341.    Plaintiff was able to perform the essential duties of his job with a reasonable accommodation.

342.    Accommodating Plaintiff would not require significant expense or difficulty from the Defendants.

343.    Accommodating Plaintiff would not significantly interfere with the safe or efficient operation of the Defendants' workplace.

344.    Accommodating Plaintiff would not require the Defendants to violate a bona fide seniority system.

345.    Defendants failed to engage in any interactive process with Plaintiff regarding Plaintiff's accommodation request.

346.     Defendants failed to engage in good faith with Plaintiff in order to understand Plaintiff's need for accommodation.

347.     Plaintiff sufficiently articulated his sincerely held religious beliefs to the Defendants.

348.     Defendants violated the NYSHRL by denying Plaintiff's request for a reasonable accommodation without first engaging in an interactive process.

349.     Defendants refused to allow Plaintiff to keep his job because Plaintiff could not receive the COVID-19 vaccine without violating his religious beliefs.

350.     Plaintiff was constructively terminated because the Defendants failed to consider any reasonable accommodations to the Vaccine Mandate.

351.     As a direct and proximate result of Defendants' failure to accommodate, Plaintiff has suffered, and continues to suffer, substantial losses, including but not limited to the loss of past and future earnings, compensation and benefits, increases, promotions, bonuses, and other employment benefits, for which Plaintiff is entitled to an award of monetary damages which exceeds the jurisdictional limits of all lower courts, and other relief.

352.     As a direct and proximate result of Defendants' failure to accommodate, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which Plaintiff is entitled to an award of monetary damages in an amount to be determined at trial.

353.     Plaintiff is thus entitled to injunctive and declaratory relief—as well as compensatory damages—for the injuries and loss sustained as a result of Defendants' unlawful discriminatory conduct under the NYSHRL, in an amount to be determined at trial.

354. Defendants made a conscious decision to violate Plaintiff's rights.

355. The Defendants knew that they were required under the law to engage in a good faith discussion with Plaintiff in an attempt to understand Plaintiff's accommodation needs. However, the Defendants did not engage in such good faith interactive process or cooperative dialogue with Plaintiff.

356. Plaintiff is further entitled to an award of attorney's fees, expert fees, and other costs under the NYSHRL. Executive Law § 297(10).

## FOURTH CAUSE OF ACTION

### (Failure to Engage in a Cooperative Dialogue in Violation of the NYCHRL)

357. Plaintiff reincorporates all preceding and subsequent statements set forth in this Complaint as if fully written herein.

358. The NYCHRL requires employers to engage in a cooperative dialogue with an employee who requests a reasonable accommodation on the basis of religion.

359. The NYCHRL provides a separate cause of action against employers who fail to engage in a cooperative dialogue with employees, like Plaintiff, who request a reasonable accommodation:

> It shall be an unlawful discriminatory practice for an employer, labor organization or employment agency or an employee or agent thereof to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice may require such an accommodation: (1) For religious needs as provided in subdivision 3 of this section.

N.Y.C. Admin. Code § 8-107 (28)(a).

360. Defendants were obligated to engage in a cooperative dialogue with Plaintiff regarding Plaintiff's need for a reasonable accommodation to the Vaccine Mandate.

361. Defendants refused to engage in any cooperative dialogue, and simply denied Plaintiff's request for a reasonable accommodation.

362. Defendants violated N.Y.C. Admin. Code § 8-107 (28)(a)(1) by failing to engage in a cooperative dialogue with Plaintiff regarding Plaintiff's request for a reasonable accommodation to the Vaccine Mandate.

363. The NYCHRL prohibits Defendants from denying Plaintiff's request for a reasonable accommodation until Defendants engage in a cooperative dialogue with Plaintiff:

> The determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue.

N.Y.C. Admin. Code § 8-107 (28)(e).

364. Defendants violated the NYCHRL by denying Plaintiff's request for a reasonable accommodation without first engaging in a cooperative dialogue.

365. Pursuant to the NYCHRL:

> The term "cooperative dialogue" means the process by which a covered entity and a person entitled to an accommodation, or who may be entitled to an accommodation under the law, engage in good faith in a written or oral dialogue concerning the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose for the covered entity.

N.Y.C. Admin. Code § 8-102.

366. The FDNY never had *any* communications with Plaintiff regarding his accommodation request before denying Plaintiff's reasonable accommodation request.

367. The Citywide Panel never had *any* communications with Plaintiff regarding his accommodation request before denying Plaintiff's reasonable accommodation request.

368.     Defendants did not communicate with Plaintiff regarding Plaintiff's accommodation needs.

369.     Defendants did not communicate with Plaintiff regarding any potential accommodations that may address Plaintiff's accommodation needs before denying Plaintiff's reasonable accommodation request.

370.     Defendants did not communicate with Plaintiff regarding alternatives to Plaintiff's accommodation request before denying Plaintiff's reasonable accommodation request.

371.     Defendants did not communicate with Plaintiff regarding the difficulties that any potential accommodations may pose to Defendants before denying Plaintiff's reasonable accommodation request.

372.     Defendants did not communicate with Plaintiff regarding Plaintiff's religious conflict with the Vaccine Mandate before denying Plaintiff's reasonable accommodation request.

373.     As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiff has suffered, and continues to suffer, substantial losses, including but not limited to the loss of past and future earnings, compensation and benefits, increases, promotions, bonuses, and other employment benefits, for which Plaintiff is entitled to an award of monetary damages which exceeds the jurisdictional limits of all lower courts, and other relief.

374.     As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which Plaintiff is entitled to an award of monetary damages in an amount to be determined at trial.

375.     As a direct and proximate result of Defendants' violations of the NYCHRL, N.Y.C. Admin. Code § 8-107 (28)(a)(1) and § 8-107 (28)(e), Plaintiff is entitled to declaratory and injunctive relief and Defendants are liable to Plaintiff for compensatory damages, including pain and suffering, in an amount to be determined at trial  pursuant to N.Y.C. Admin. Code §8-502(a), and for costs and reasonable attorney's fees pursuant to N.Y.C. Admin. Code §8-502(g).

## Prayer for Relief

**WHEREFORE**, the Plaintiff prays that this Court grant judgment to him containing the following relief:

A.     A declaratory judgment that the Defendant's failure to accommodate and failure to engage in a cooperative dialogue with Plaintiff are unlawful discriminatory practices under the New York City Human Rights Law and the New York State Human Rights Law;

B.     A declaratory judgment that the Defendant's actions violated the Plaintiff's rights pursuant to the Free Exercise Clause of the First Amendment of the United States Constitution;

C.     An award to Plaintiff of compensatory damages for the financial consequences of Defendant's actions, including but not limited to Plaintiff's lost wages, back pay, front pay, overtime, pension, benefits, moving costs, in an amount to be determined at trial;

D.     An award to Plaintiff of compensatory damages for the pain and suffering, humiliation, mental anguish, damages to reputation and livelihood, and emotional distress sustained by Plaintiff in an amount to be determined at trial;

E.     An award to Plaintiff compensating him for the deprivation of his right to be free from religious discrimination under city, state, and federal law, including the United States Constitution;

F.      An award to Plaintiff for costs in this action, including reasonable attorney's fees and expert fees under 42 U.S.C. §1988, the New York City Human Rights Law and New York State Human Rights Law;

G.      An order for civil fines and penalties pursuant to New York Executive Law § 297(9);

H.      An award of pre- and post-judgment interest on all amounts awarded to the Plaintiff at the highest rates and from the earliest dates allowed by law on all causes of action;

I.      Such other and further relief this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury for all the issues leaded herein so triable.

Dated:  Staten Island, New York          Respectfully submitted,
        March 7, 2025

_____
Christina Martinez, Esq.
Law Offices of Christina M. Martinez
245 Bricktown Way, Suite J
Staten Island NY 10309
T: (347) 215-4543
ChristinaMartinezEsq@gmail.com

*Attorney for Plaintiff*

**VERIFICATION**

STATE OF FLORIDA       )
                                   )    ss.

COUNTY OF St. John's      )

I, SEAN FENNESSY, being duly sworn, deposes and says:

1. I am the Plaintiff in the within action.

2. I have reviewed the contents of this Complaint and verify that the statements contained herein are true to the best of my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.

3. I am aware that if any of the statements contained in the Complaint are willfully false, I am subject to punishment.

SEAN FENNESSY
FL DL# F520793821740    Exp. 5/14/2030

Sworn to before me this
1st day of March, 2025

Edward Joseph Kruthoff Jr.
Notary Public

Notary Public State of Florida
Edward Joseph Kruthoff Jr.
My Commission HH 413799
Expires 6/22/2027